Slip Op. 07-92

## UNITED STATES COURT OF INTERNATIONAL TRADE

AGATEC CORP.,

                 Plaintiff,

           v.

UNITED STATES,

                 Defendant.

Before:  Richard W. Goldberg,
            Senior Judge

Court No. 03-00165

### OPINION

[Plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted.]

Dated: June 6, 2007

Weiss Berzowski Brady LLP (Barry R. White) for Plaintiff Agatec Corp.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director Barbara S. Williams, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (James A. Curley); Su-Jin Yoo, Office of Assistant Chief Counsel, Bureau of Customs and Border Protection, United States Department of Homeland Security, of counsel, for Defendant United States.

**Goldberg, Senior Judge**: This is a classification case brought by

plaintiff Agatec Corp., a distributor of electrical levels and

accessories manufactured by Agatec France, against defendant U.S.

Customs and Border Protection ("Customs").  Before the Court are

the parties' cross-motions for summary judgment under USCIT Rule

56.

I.    **BACKGROUND**

On February 6, 2002, Agatec imported a shipment of two

varieties of electrical laser levels, the A410S and the GAT120,

along with several accessories.   In its import documentation,

Agatec classified the merchandise under subheading 9015.30.4000

of the Harmonized Tariff Schedule of the United States (2002)

("HTSUS").   Customs liquidated the merchandise on June 6, 2002

under subheading 9031.49.9000 of the HTSUS.   Agatec timely

protested Customs' classification.   After Customs denied the

protest, Agatec commenced this case pursuant to 19 U.S.C. §

1514(a) and 28 U.S.C. §§ 2631-37.   The Court has jurisdiction

under 28 U.S.C. § 1581(a).


II.   **RECORD CHARACTERISTICS OF THE IMPORTED PRODUCT**

The A410S and GAT120 products at issue in this case emit

horizontal or vertical beams of light allowing the user to find

level and plumb.   See Tawil Aff. ¶ 3; Def.'s Resp. Pl.'s Stat.

"Undisputed" Facts 2-3.   Both laser levels can be used only in

one dimension.   Kiss Decl. ¶ 7.   Their maximum operational range

is 1000 feet.   Id. ¶ 7 (citing Pl.'s Ex. A (The Level of

Excellence) (Agatec's product catalogue) at 6 & 8).

Both levels are usually mounted on a tripod, especially

when it is helpful to give the laser some height off the ground.

Tawil Aff. ¶ 7; Def.'s Resp. Pl.'s Stat. "Undisputed" Facts 9.

The levels may work in tandem with a receiver which is mounted on

an excavator or grade rod to receive the level's beam.  Tawil
Aff. ¶ 7; Def.'s Resp. Pl.'s Stat. "Undisputed" Facts 9.

        The A410S and GAT120 levels are used in construction
projects for houses or small buildings, as well as landscaping
for such structures.  Kiss Decl. ¶¶ 6-7 & 9; Pl.'s Ex. C at 2
(instruction manual for GAT120 electronic level); Pl.'s Ex. D at
2 (instruction manual for A410S automatic laser).  The
instruction manual for the GAT120 level describes the product as
"ideal for leveling applications in the construction industry."
Pl.'s Ex. C at 2.  It can be used for indoor and outdoor
projects.  Id.  Agatec's product catalogue advertises the GAT120
as "[i]deal for contractors who work primarily in horizontal, but
have occasional use for vertical alignment at short distances."
Pl.'s Ex. A, at 6.  The instruction manual for the A410S level
describes the product as "an automatic visible laser that can be
used for leveling, vertical alignment, plumbing and squaring.
Applications include installing suspended ceilings, technical
flooring, partitions and a variety of outdoor alignment work."
Pl.'s Ex. D at 2.  Notwithstanding its occasional outdoor
applications, the A410S product was "designed with the interior
contractor in mind," Pl.'s Ex. A at 13, and is used for
"[i]nstalling and aligning tilt-up walls, partitions and window
and door frames" as well as "[s]quaring walls, decks, and
foundations."  Id. at 8.  In addition to the functionality
described in the product catalogue and instruction manuals,
Agatec president Gabriel Tawil states that with the help of a

receiver mounted on an excavator, "the laser precisely measures
the distance above or below an established benchmark."  Tawil
Aff. ¶ 3.

Customs produced an affidavit of Richard Kiss, the Chief of
Survey for the New York District of the Operations Division of
the U.S. Army Corps of Engineers.  Kiss describes the operability
of these laser levels as one of "lower order surveying," which he
defines in distinction to "higher order surveying."  See id. ¶¶
5-7.  "Higher order survey" levels require great accuracy and
operate in three dimensions.  Kiss Decl. ¶¶ 5 & 7.  The U.S. Army
Corps of Engineers executes "higher order surveying" projects
such as preparing land or hydrographic maps, establishing
boundaries, preparing for the construction of major public works
such as dams, highways or bridges, calculating the area of a
piece of land, triangulating, or determining the height of
objects above or below some horizontal reference level.  See id.
¶ 5.  Kiss lists representative "lower order surveying"
applications as "smaller-scale foundation and landscaping work,
and interior work such as finding level and plumb."  Id. ¶ 9.

### III.  CONTESTED HTSUS HEADINGS

Agatec believes that both the GAT120 and the A410S laser
levels are correctly classified under HTSUS 9015.30.4000.
Customs classified the laser levels under HTSUS 9031.49.9000 and
the parts and accessories under HTSUS 9031.90.5800.

HTSUS subheading 9015.30.4000 covers:

>Surveying (including photogrammetrical surveying), hydrographic, oceanographic, hydrological, meteorological or geophysical instruments and appliances, excluding compasses; rangefinders; parts and accessories thereof:
>...
>Levels:
>...
>Electrical . . . .

HTSUS 9015.30.4000.  By contrast, HTSUS subheading

9031.49.9000 covers:

>Measuring or checking instruments, appliances and machines, not specified or included elsewhere in this chapter; profile projectors; parts and accessories thereof:
>...
>    Other:
>...
>    Other . . . .

Id. 9031.49.9000.  HTSUS subheading 9031.90.5800 covers "parts

and accessories . . . of other optical instruments and

appliances, other than test benches . . . ."  Id. 9031.90.5800.


### IV.   **STANDARD OF REVIEW**

"[S]ummary judgment is proper 'if the pleadings [and the

discovery materials] show that there is no genuine issue as to

any material fact and that the moving party is entitled to a

judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)) (alteration

added).[1]  "In ruling on cross-motions for summary judgment, the

---

[1]  "When the Court's rules are materially the same as the [Federal Rules of Civil Procedure ("FRCP")], the Court has found it appropriate to consider decisions and commentary on the FRCP in interpreting its own rules."  Former Employees of Tyco Elec.

court must determine if there exist any genuine issues of
material fact and, if there are none, decide whether either party
has demonstrated its entitlement to judgment as a matter of law."
Am. Motorists Ins. Co. v. United States, 5 CIT 33, 36 (1983).
The appropriate standard of review consists of two separate
inquiries: (1) a de novo review of Customs' legal interpretations
of the tariff headings, see 28 U.S.C. § 2640(a)(1); and (2) a
non-deferential review of Customs' factual findings subject to a
presumption of correctness in favor of Customs, see id. §
2639(a)(1).   Cf. Universal Elec., Inc. v. United States, 112 F.3d
488, 493 (Fed. Cir. 1997) (holding that "as a practical matter"
the presumption of correctness "has force only as to factual
components" of a Customs classification decision).


## V.   DISCUSSION

A.   Is HQ 965484 Entitled to Judicial Deference?

     When reviewing a Customs classification, the Court is not
bound by the authority of any Customs ruling or interpretation.
However, where Customs has issued a thorough and logical ruling
that reflects its expertise in administering its detailed
statutory scheme and accords with its previous interpretations,
such decision may "claim respect" in proportion to its
persuasiveness under Skidmore v. Swift & Co., 323 U.S. 134

---

v. U.S. Dep't of Labor, 27 CIT 380, 385, 259 F. Supp. 2d 1246,
1251 (2003).

(1944).  United States v. Mead Corp., 533 U.S. 218, 221 (2001);

see id. at 235.

    Here, Customs argues in favor of extending Skidmore

deference to HQ 965484, a prior Customs classification ruling

analyzing whether certain merchandise was a "surveying

instrument" as understood by HTSUS heading 9015.  In that ruling,

Customs responded to a protest by TLZ, Inc., a company that had

imported three varieties of "electro-mechanical pendulum-based

leveling system" using a laser diode.  HQ 965484 at 1.  The laser

diode is suspended on a pendulum and uses gravity to find true

level.  See id.  All three items were utilized in construction

projects to "align pipes, piers, and posts; square foundations,

walls, decks, window frames and door frames; plumb walls, posts

and door frames; set drainage grades; and furnish reference

points for HVAC (heating, ventilation, air conditioning),

lighting, sprinkler systems and skylights."  Id.  In short, TLZ's

products were in some respects similar, though by no means

identical, to Agatec's laser levels.  Customs analyzed the

relevant HTSUS headings and determined that TLZ's laser diodes

were not described in HTSUS heading 9015.  That determination

rested on two alternative premises: (1) "protestant has not

established that these goods are used for surveying or that they

are surveyor's levels"; and (2) the goods "are within the

exclusion of [Explanatory Note] 90.15 . . . ."  Id. at 2.  The

cited Explanatory Note suggested that "levels (air bubble type,

etc.) used in building or constructional work" are not covered by

HTSUS heading 9015.  The entirety of the agency's analysis of

that issue is as follows:

> We find that the [TMZ laser diodes] are within the
> exclusion of EN 90.15, excerpted above.  The laser
> diode aids these goods in determining true level.
> Therefore, we find that they are not described in
> heading 9015, HTSUS.

Id.

    Customs contends that the Court should defer to the HQ

965484's holding "that construction laser levels are classifiable

under Heading 9031 and not Heading 9015 . . . ."  Def.'s Br. 17-

18.  The problem with that contention is that HQ 965484 says

nothing of the sort.  In sum, HQ 965484 contains a

straightforward recitation of the statutory HTSUS text, as well

as two factual findings: (1) that TLZ had failed to prove that

their laser diodes were used in surveying and (2) that the TMZ

laser diodes fell within the "construction levels" exclusion of

the explanatory note.

    It is inappropriate to apply Customs' findings in one

highly fact-specific classification ruling to a different

product.  See Structural Indus., Inc. v. United States, 356 F.3d

1366, 1371 (Fed. Cir. 2004) ("[P]rior rulings with respect to

similar but non-identical items are also of little value in

assessing the correctness of the classification of a similar but

not identical item.").  The factual findings contained in HQ

965484 respect an import product that is similar, though by no

means identical, to the A410S and GAT120 laser levels.  No

deference is therefore due to Customs' classification of the TLZ

laser diodes.  On the other hand, if Customs is arguing that HQ
965484 articulates a broad principle that all construction levels
— and not merely the TMZ laser diodes — are classifiable under
heading 9031, HQ 965484 is hardly the sort of thorough and
logical explanation to which a court may defer under Skidmore.
Indeed, no fair reading of the ruling could countenance such an
expansive interpretation.  The agency's decision in that protest
review remained focused squarely on the product at issue, and
avoided generalized characterizations of construction levels.
The Court finds that for purposes of this case HQ 965484 is not
entitled to Skidmore deference.


B.     Are Agatec's A410S and GAT120 Levels, Along with Their
       Accessories, Classifiable Under Heading 9031 of the HTSUS?

       The U.S. Court of Appeals for the Federal Circuit's
statement of law in Orlando Food Corp. v. United States applies
equally to this case:

        The proper classification of merchandise entering the
        United States is directed by the General Rules of
        Interpretation ("GRIs") of the HTSUS and the
        Additional United States Rules of Interpretation.  The
        HTSUS scheme is organized by headings, each of which
        has one or more subheadings; the headings set forth
        general categories of merchandise, and the subheadings
        set forth a more particularized segregation of the
        goods within each [heading] category.  At issue in
        this case are two headings of the HTSUS and their
        accompanying subheadings . . . .

140 F.3d 1437, 1439 (Fed. Cir. 1998).  Under GRI 1, a court is to
construe the competing headings to determine the heading under
which the merchandise at issue is classifiable.  See id. (citing
GRI 1, HTSUS).  The express terms of heading 9031 exclude any

imported merchandise that could be classified under heading 9015.

See HTSUS 9031 (including measuring or checking instruments "not
specified or included elsewhere in this chapter").  As such, the
parties agree that the critical question in this case is whether
heading 9015 applies to the merchandise.

The Federal Circuit has similarly provided guidance as to
how courts should construe HTSUS language:

> HTSUS terms are construed according to their common
> and commercial meanings, which are presumed to be the
> same absent contrary legislative intent.    In
> construing a tariff term, the court may rely on its
> own understanding of the terms as well as upon
> lexicographic and scientific authorities.  The court
> may also refer to the Explanatory Notes accompanying a
> tariff subheading.   While these notes are not
> controlling legislative history, they are nonetheless
> intended to clarify the scope of HTSUS subheadings and
> to offer guidance in their interpretation.

Len-Ron Mfg. Co., Inc. v. United States, 334 F.3d 1304, 1309
(Fed. Cir. 2003) (citations omitted).  In a case such as this,
where the relevant tariff classification is controlled by use,
Customs must classify the merchandise "in accordance with the use
in the United States at, or immediately prior to, the date of
importation, of goods of that class or kind to which the imported
goods belong, and the controlling use is the principal use . . .
."  Additional U.S. Rule of Interpretation 1.  "Principal use" is
the use that "exceeds any other single use."  Lenox Collections
v. United States, 20 CIT 194, 196 (1996) (quotation marks
omitted).

Agatec argues that its laser levels are electrical
"surveying" equipment.  Agatec relies heavily on the 2002

decision Heli-Support v. United States, which contains a helpful

discussion of prior judicial interpretations of HTSUS heading

9015.   See Heli-Support, Inc. v. United States, 26 CIT 352

(2002).   The imported product at issue in Heli-Support was a

helicopter- or aircraft-mounted high precision instrument used to

measure topography with a laser for later cartographic use.   See

id. at 353.   The court stressed the broad scope of HTSUS heading

9015, noting that surveying includes more than "mere surface

examinations" and was intended to include items that are not the

traditional tools of a surveyor's trade.   Id. at 355-56.

Ultimately, the court held that the imported product was

classifiable under heading 9015 and that the plaintiff's

interpretation of heading 9015 to include only instruments "used

in the practice and science of surveying by a surveyor" was

incorrect.   Id. at 356.

        In finding that the imported instruments fell within the

scope of heading 9015, the court drew on three dictionary

definitions of the terms "survey" and "surveying."   Surveying,

according to the Columbia Encyclopedia (2d ed. 1950), is defined

as "the science of finding the relative position on or near the

earth's surface.   Boundaries, areas, elevations, construction

lines, and geographical or artificial features are determined by

the measurement of horizontal and vertical distances and angles

and by computations based in part on the principles of geometry

and trigonometry."   Id.   Encyclopedia Americana (1953) defines

"surveying" as

the science of determining the positions of points on
the earth's surface for the purpose of making
therefrom a graphic representation of the area.  By
the term earth's surface is meant all of the earth
that can be explored — the bottoms of seas and rivers,
and the interior of mines, as well as the more
accessible portions.  It includes the measurement of
distances and angles and the determination of
elevations.

Id.  The court then quoted a third and final definition of

"surveying" from Webster's Third New International Dictionary of

the English Language (1981) ("Webster's"):

1. Survey: . . . 2: to determine and delineate the
form, extent, and position of (as a tract of land, a
coast, or a harbor) by taking linear and angular
measurements and by applying the principles of
geometry and trigonometry . . . .

2. Survey: . . . 3a: the process of surveying an area
of land or water: the operation of finding and
delineating the contour, dimensions, and position of
any part of the earth's surface whether land or water
(a topographic and hydrographic, of a locality) . . .
.

Id. at 355-56.

Consideration of the three definitions cited in Heli-

Support results in a complicated picture.  All three definitions

would seem at first blush to accommodate Agatec's laser levels,

which are capable of executing "precise[] measure[ments of] the

distance above or below an established benchmark."  Pl.'s Stat.

Mat. Facts Not Dispute ¶ 4.  Recalling, however, that use

designations must be made on the basis of a product's principal

use, see Lenox Collections, 20 CIT at 196, it is obvious that

Agatec's laser levels are not "surveying" instruments and are

therefore not classifiable under heading 9015.  Nowhere in the

laser levels' instruction manuals or catalogue product

descriptions does Agatec mention its levels' ability to measure distance.  The laser levels themselves are incapable of spatial measurement; only with the help of a mounted receiver device, such as the MR80S, can they do so.  See id. ¶¶ 4 & 17.

Still other infirmities undermine Agatec's attempt to fit its laser levels into the cited definitions.  It is not enough that a product be able to measure distance precisely; all three definitions include additional definitional prerequisites.  For example, they all invoke the "earth's surface" as a benchmark for the surveying measurements.  The Columbia Encyclopedia refers to the measurement of distances and angles "on or near the earth's surface."  Heli-Support 26 CIT at 355.  Encyclopedia Americana requires that the measurements be made relative to the "earth's surface" itself.  Id.  Webster's refers to "delineating the contour, dimensions, and position of any part of the earth's surface."  Id.  Agatec's laser levels operate chiefly in a construction environment, and are not principally measuring positions relative to the earth's surface.[2]

---

[2]  The Explanatory Note to heading 9015 provides explicitly that some instruments used in "constructional work" are included in heading 9015.  It lists the varieties of instruments includable in heading 9015:

> These are generally intended for use in the field, for example, in cartography (land or hydrographic maps); in the preparation of plans; for triangulation measurements; for calculating the area of a piece of land; in determining heights above or below some horizontal reference level; and for all similar measurements in constructional work (building roads, dams, bridges, etc.), in mining, in military operations, etc.

     The A410S instruction manual lists its primary applications

as "installing suspended ceilings, technical flooring, partitions

and a variety of outdoor alignment work."  Pl.'s Ex. D at 2.

Indeed, the A410S is designed for use by interior construction

contractors, <u>see</u> Pl.'s Ex. A at 13, a trade that is by definition

involved in edifying spaces that are distinct from the earth's

surface.  The GAT120 level is "ideal for leveling applications in

the construction industry."  Pl.'s Ex. C at 2.  Nowhere in the

instruction manuals and the product catalogues is it suggested

that the laser levels are used to measure the surface of the

earth or determine the relative position of points to the earth's

surface.  Even the president's affidavit, which is the only

evidence Agatec has produced referring to the measuring

capabilities of the laser levels, stops short of describing such

use as the <u>principal</u> use.[3]  Looking at all the record evidence,

references to construction applications overshadow the sporadic

---

<u>Explanatory Notes</u>, Chapter 90.15, 1603 (2d ed. 1996).  Read in
context, the mention of "constructional work" refers back to the
listed "similar measurements" that properly determine the scope
of heading 9015.  It is the nature of those "similar
measurements" with which the Explanatory Note is concerned, and
the reference to "constructional work" simply affirms that
surveying work is not excludable from the ambit of heading 9015
on account of its being "constructional" in nature.  It is not,
as Agatec seems to suggest, an independent expansion of heading
9015 to cover all merchandise roughly analogous to surveying
instruments that is used in the "constructional" industry.

[3]  Agatec's product catalogue has a separate section for
"Construction/Surveying Equipment."  <u>See</u> Pl.'s Ex. A at 1
(providing table of contents for product catalogue).  Neither the
GAT120 nor the A410S is included in that section.  <u>See id.</u> at 20-
22.  Instead, both appear in the "General Construction" section.
<u>See id.</u> at 6 & 8.

mentions of direct measurement of the earth's surface.
Measurements incident to man-made construction projects may be
taken "near" the earth surface and therefore such measurements
are not excludable for that reason from the Columbia
Encyclopedia's definition.  However, the Encyclopedia Americana
and Webster's require the determination of positions of points on
the earth's surface.  As such, those definitions are not
susceptible to a reading that would include Agatec's laser
levels.[4]

    Webster's reports an alternative definition of "survey"
that does not refer to the earth's surface as a benchmark.  "To
survey" is defined as "to determine and delineate the form,
extent, and position of . . . by taking linear and angular
measurements and by applying the principles of geometry and
trigonometry."  Heli-Support, 26 CIT at 355.  This definition
does not require the measurements to be relative to the earth's
surface.  On the other hand, it requires the taking of linear and
angular measurements and the application of geometric and
trigonometric principles.  Agatec's laser levels are capable of
measuring in one dimension only and there is no evidence that
they can measure angles.  See Kiss Decl. ¶ 7; Pl.'s Resp. Def.'s

---

[4]  The Encyclopedia Americana definition also requires the
surveying measurements to be made "for the purpose of making
therefrom a graphic representation of the area."  Heli-Support,
26 CIT at 355.  Nowhere in the record is it suggested that
Agatec's laser levels may be used in such a capacity.
Furthermore, nowhere is it suggested that the targeted operators
of Agatec's laser levels create graphic representations based on
the measurements registered by the laser levels.

Stat. Mat. Facts Not Dispute ¶ 13.  Moreover, Agatec has not

adduced any evidence at all to establish how geometric or

trigonometric principles may be applied to the data obtained from

the laser levels' measurements to discern the form and the

position of objects.

    As a final note, the Court should address the Explanatory

Note to heading 9015, invoked in support of both parties'

arguments.  The Explanatory Note explicitly includes instruments

used "in determining heights above or below some horizontal

reference level."  Explanatory Notes, Chapter 90.15, at 1603.

The Explanatory Note concludes with the following limitation:

"This heading does not cover . . . [l]evels (air bubble type,

etc.) used in building or constructional work (e.g., by masons,

carpenters or mechanics), and plumb-lines (heading 90.31)."[5]  Id.

at 1604.  The Explanatory Note, which of course in no way hems

the Court's discretion to interpret the various headings, see

Len-Ron Mfg., 334 F.3d at 1309, sets up a mutually exclusive set

---

[5]  Agatec also argues that the exclusionary clause of the
Explanatory Note covers air bubble levels only.  See Pl.'s Reply
10.  On Agatec's reading, the exclusionary note differentiates
between electrical levels (which are covered by heading 9015) and
non-electrical levels (which are not).  A quick glance at the
text of the Explanatory Note suffices to demonstrate the
incorrectness of that position.  The parenthetical reads "air
bubble type, etc."  The use of "et cetera" (albeit complicated by
the puzzling choice of "e.g." later in the same sentence) must
mean that "air bubble type" levels are intended merely as an
illustrative example of a level "used in building or construction
work" rather than a further turn in the already labyrinthine
classification apparatus of heading 9015.  The relevant
distinction, then, is between levels used in construction work
and surveying instruments.

of categories: (1) instruments used in determining heights above
or below a horizontal reference level and (2) instruments that
are levels used in building or constructional work.  As noted
above, the A410S and GAT120 laser levels seem to fit both
descriptions.  The principal use of the products will control,
and the record demonstrates that such use is apparently that of a
level used in construction work.  Thus, the Explanatory Note
supports the Court's independent finding that the common
dictionary meanings prevent a classification of the A410S and
GAT120 laser levels under heading 9015 of the HTSUS.


C.   *If Agatec's A410S and GAT120 Levels Are Not Classifiable
     Under Heading 9015, Are They Classifiable under Heading
     9031?*

     Heading 9031 includes "[m]easuring or checking instruments,
appliances and machines, not specified or included elsewhere in
this chapter . . . ."  Heading 9031, HTSUS.  "Checking" is the
present participle of "check," which Webster's defines as "to
inspect and ascertain the condition of esp. in order to determine
if the condition is satisfactory" or to "investigate and ensure
accuracy, authenticity, reliability, safety, or satisfactory
performance of."  Webster's 381.  "Measuring" is the present
participle of "measure," which Webster's defines as "to lay off,
mark, or fix (a specified distance or extent) by making
measurements" or "to appraise in comparison with something taken
as a criterion."  Id. 1400.  The A410S and GAT120 laser levels
are optical instruments that aid in leveling, alignment,

plumbing, and squaring for building and construction projects.

See supra Part II at 3.  In addition, they may measure distance

in one dimension.  See id.  These functionalities obviously

constitute measuring and checking as defined by Webster's and

therefore classifiable under heading 9031.

Subheading 9031.49 includes those measuring or checking

instruments that (1) are "other optical instruments and

appliances" and (2) are not used for inspecting semiconductor

wafers.  See HTSUS 9031.49.  The Explanatory Note to subheading

9031.49 provides that "[t]his subheading covers not only

instruments and appliances which provide a direct aid or

enhancement to human vision, but also other instruments and

apparatus which function through the use of optical elements or

processes."  Explanatory Notes, Chapter 90.31, at 1658.  The

A410S and GAT120 laser levels utilize visible laser beams to aid

human sight when aligning, plumbing, squaring, and leveling.

They are therefore classifiable under heading 9031, subheading

49.


                    VI.   CONCLUSION

After careful review of the record, the relevant HTSUS

provisions, and the parties' thorough and thoughtful briefs, the

Court finds that Customs has conclusively established that

Agatec's A410S and GAT120 laser levels were properly classified

under HTSUS 9031.49.9000.  There remain no genuine issues of

material fact, and judgment shall be entered in favor of Customs

in this case.


                                        ___/s/ Richard W. Goldberg__
                                           Richard W. Goldberg
                                           Senior Judge

**Dated:**      **June 6, 2007**
              **New York, New York**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

AGATEC CORP.,

                Plaintiff,

           v.

UNITED STATES,

                Defendant.

Before:  Richard W. Goldberg,
         Senior Judge

Court No. 03-00165

**JUDGMENT**

    Upon review of the parties' respective motions for summary judgment, and upon due deliberation, it is hereby

    **ORDERED** that Plaintiff Agatec Corp.'s Motion for Summary Judgment is DENIED; and it is further

    **ORDERED** that Defendant U.S. Customs and Border Protection's Motion for Summary Judgment is GRANTED; and it is further

    **ORDERED** that judgment be entered in favor of Defendant United States Customs and Border Protection.

    **IT IS SO ORDERED**

                          **/s/ Richard W. Goldberg**
                          **Richard W. Goldberg**
                          **Senior Judge**

**Date:** **June 6, 2007**
      **New York, New York**

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____

Deputy Clerk